#30327-r-MES
**2024 S.D. 78**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellant,

    v.

NATHAN ANTUNA,                          Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BRULE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHRIS GILES
Judge

* * * *

MARTY J. JACKLEY
Attorney General

NOLAN WELKER
CHELSEA WENZEL
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff and
    appellant.


JOHN R. MURPHY
Rapid City, South Dakota                          Attorney for defendant and
    appellee.

* * * *

CONSIDERED ON BRIEFS
MARCH 20, 2024
REASSIGNED
OCTOBER 8, 2024
OPINION FILED **12/11/24**

#30327

SALTER, Justice (on reassignment).

[¶1.] In February 2022, a Brule County grand jury returned an indictment charging Nathan Antuna with third-degree rape, alleged to have occurred in August 2016. Antuna sought an order requiring the State to obtain information related to any mental health treatment records of the victim, K.B. The State objected, stating it had no such records in its possession, nor did it know if any existed. Following a hearing, the circuit court entered an order directing the State to determine whether such records existed and, if so, provide them to the court for an in-camera review. The State, on behalf of K.B., notified the court that K.B. was asserting her rights under Marsy's Law. In turn, Antuna served a subpoena duces tecum on K.B. seeking the same records, which the State moved to quash. The court did not rule on the motion to quash but, instead, ordered the State to speak with K.B. to investigate whether any mental health records existed, obtain any records by subpoena, and provide them to the court for an in-camera inspection. The State filed a petition for an intermediate appeal, which we granted. We now reverse the circuit court's order and direct the court to enter an order granting the motion to quash.

### Factual and Procedural Background[1]

[¶2.] In August 2016, K.B. and a friend visited a local bar in Chamberlain where they met a group of men, including Antuna, in town for work. K.B.'s friend

---

1. The facts in ¶¶ 2–4 are gleaned from the facts related by the parties' submissions on appeal and in the circuit court. The facts, insofar as they go, are not disputed, and, though they are necessary to set the context for our analysis, we note that there has been no actual factfinding at this point.

left around 11:30 p.m., but K.B. remained at the bar with the men. The following morning, K.B. awoke in her bed, having no memory of how she had gotten home. She recalled going out and meeting the group of men but nothing beyond that. K.B. "did not think she had sexual intercourse but was not sure." These circumstances prompted K.B.'s sister to take K.B. to a local hospital where a sexual assault examination was performed, and the materials collected were subsequently submitted to the South Dakota State Forensic Laboratory (state crime lab) for testing.

[¶3.] That same day, law enforcement interviewed the men from the group, including Antuna. Antuna confirmed meeting K.B. and drinking with her at the bar but denied having any sexual contact with her. Based on the denials of the men during their interviews and K.B.'s own doubt that intercourse occurred, law enforcement did not collect DNA samples from the men for comparison. Nonetheless, K.B.'s vaginal swabs ultimately tested positive for the presence of sperm, but by the time law enforcement received these results, the men had left the area.

[¶4.] In September 2021, however, the state crime lab conducted a periodic search of the Combined DNA Index System (CODIS) and matched DNA from sperm cell samples taken from K.B.'s vaginal swabs to Antuna's DNA.[2] Based on this preliminary information, law enforcement procured a search warrant for a known sample of Antuna's DNA. Antuna's known DNA sample was later obtained and

---

2. By this time, the state crime lab had received information regarding Antuna's DNA profile through a means unrelated to this case.

confirmed that his DNA matched to samples obtained from the sperm cells found on K.B.'s vaginal swabs.

[¶5.] In February 2022, a Brule County grand jury returned an indictment charging Antuna for third-degree rape under the theory that K.B. was "incapable of giving consent because of any intoxicating, narcotic, or anesthetic agent or hypnosis[.]" SDCL 22-22-1(4). Antuna subsequently moved for disclosure of K.B.'s "treatment records." But Antuna was uncertain as to whether there were any such records, so he asked the circuit court to order the State to:

- "disclose all medical reports related K.B.'s physical and/or mental condition between August 2, 2016, and the present that relate to the allegations made in this criminal case;"

- "obtain from [K.B.] the names of all counselors, therapists, or other mental health treatment providers that she has conferred with regarding the allegations made in this case . . . ; and,"

- "obtain all records from the providers identified [above] and to release them to defense counsel subject to a protective order . . . ."

[¶6.] Antuna claimed he has a constitutional right to disclosure of the records by virtue of his right of confrontation and the due process right described in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).[3]

---

3. In *Brady v. Maryland*, the United States Supreme Court held that the defendant's due process rights were violated when favorable evidence was withheld by the State. 373 U.S. at 87, 83 S. Ct. at 1196-97. *Brady* was later extended to impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985), and the resulting rule imposes an obligation upon prosecutors to unilaterally disclose what is now commonly known as *Brady* material. A prosecutor violates *Brady* by suppressing "evidence [that] is material either to guilt or to punishment,

(continued . . .)

-3-

Anticipating the assertion of a crime victim's right to privacy set out in Article VI, § 29 of our Constitution (Marsy's Law), Antuna articulated a hierarchical framework under which "[a]ny rights given to K.B. under Marsy's Law are subservient to Antuna's state and federal constitutional rights."

[¶7.]     The State objected, asserting that K.B.'s mental health records, if any, were not within its possession, custody, or control. Additionally, the State maintained that neither the constitutional rights nor discovery rights cited by Antuna "requir[ed] the State to gather materials on behalf of [Antuna] for discovery purposes."

[¶8.]     At a September 2022 hearing, Antuna expressed concern that the State "only intend[ed] to provide matters that are in its possession." He contended that "*Brady* and its progeny don't create a loophole for the State to avoid disclosure . . . by not taking them into their possession." Further, Antuna noted that, under SDCL 23A-13-4, "the State is under an obligation to exercise due diligence and to disclose things that it knows about or could know about through the exercise of due diligence."

[¶9.]     The State acknowledged its obligation to comply with discovery statutes and *Brady*, but it asserted it was unaware of the existence of any counseling and mental health records for K.B. In the State's view, neither SDCL 23A-13-4 nor *Brady* were discovery tools that could be used to compel the State to collect evidence for the defense. The circuit court determined that the State must

_____

(. . . continued)
    irrespective of the good faith or bad faith[.]" *Brady,* 373 U.S. at 87, 83 S. Ct. at 1196–97.

exercise due diligence to inquire as to the existence of any counseling or mental health records.

[¶10.]        In a September 26, 2022 order, the circuit court directed the State to:

> (1) make inquiries with K.B. as to whether she has received any mental health, counseling, or treatment since August 2, 2016, and ascertain where or from whom such services were provided; (2) attempt to obtain these records from the providers with K.B.'s assistance; (3) if such records are received by the State, for the State to provide them to the [c]ourt for its *in camera* review; and, (4) if K.B. refuses to cooperate with the State or objects to the disclosure of the records to the [c]ourt, for the State to notify the [c]ourt so that further proceedings may be considered.

Antuna did not serve the State with a notice of entry regarding the court's September 26 order.

[¶11.]        On November 29, 2022, the State notified the circuit court that K.B. was asserting her constitutional rights under Marsy's Law, including the right to privacy and its constituent right to refuse a "discovery request[.]" S.D. Const. art. VI, § 29 (6). The State asserted, on behalf of K.B. and with her express permission, that the court "does not have the authority to compel K.B. to disclose her mental health information, if any exists." Additionally, the State also notified the court of K.B.'s intention to assert her psychotherapist-patient privilege under SDCL 19-19-503.

[¶12.]        In light of K.B.'s assertion of rights, the circuit court scheduled a second hearing to address how to proceed. In the interim, Antuna served a subpoena duces tecum upon K.B. seeking the same treatment records. The State moved to quash the subpoena restating its earlier arguments and also asserting that the information was not subject to disclosure through a subpoena. The State

cited our decision in *Milstead v. Johnson*, 2016 S.D. 56, 883 N.W.2d 725, which, in turn, relied upon a three-factor test for disclosure established by the United States Supreme Court in *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974).

[¶13.] At the second hearing, the circuit court declined to rule on the State's motion to quash or apply the *Nixon* factors. Instead, it stated that it must first "ascertain whether or not there are even any relevant records" before determining the details of disclosure and conducting an in-camera review. The court initially proposed scheduling a hearing at which K.B. would appear pursuant to a subpoena to answer under oath whether she had seen any counselors:

> We're going to have to schedule a hearing. K.B. is going to have to be subpoenaed to appear at that hearing. And I think the questions to K.B. would be: Have you seen any counselors in the last five or six years since this alleged incident took place? If she says no, we're done, and that line of discovery is over with. If she says yes, then I think she can be asked who and where and the time frames because then those records are discoverable for in camera inspection.
>
> Now, I think the subpoenas can come from the defendant directing the material be turned directly over to the Court to protect K.B.'s rights and privacy.

[¶14.] After further discussions with the parties, the circuit court ultimately altered its plan to eliminate the requirement for K.B. to appear to disclose whether she had received counseling or mental health treatment. In its written March 9, 2023 order, the court directed the State to assist K.B. in producing an affidavit stating whether she received counseling or mental health treatment. If K.B. indicated that she had received this treatment, the court instructed the State to subpoena any related records in order to provide them to the court for its review in-

camera. Fifty days later, on April 28, the State filed a petition for discretionary appeal. In its petition, the State asked that we reverse the court's "First and Second Orders and related oral rulings[.]"

[¶15.] Antuna filed a motion to dismiss the petition for discretionary appeal, arguing it was not timely. *See* SDCL 15-26A-13 (requiring a petition for discretionary appeal to be filed "within ten days after notice of entry of such order"). On June 5, 2023, we granted the petition to appeal but ordered the parties to "brief upon the jurisdictional issue raised in Respondent's motion to dismiss in addition to the issue raised in the original petition." After reviewing the submissions of the parties, we conclude the State's petition was timely. There is insufficient evidence in the record to establish that Antuna served the State with notice of entry of either order, but in our view, we are reviewing only the March 2023 order which effectively superseded the September 2022 order.

## Analysis and Decision

[¶16.] The circuit court's March 2023 order cited "Mr. Antuna's confrontation, due process, and discovery rights [under SDCL 23A-13-4]" as the legal bases to require the State to essentially compel K.B. to disclose whether she had sought counseling as a result of the alleged rape. In our view, these authorities do not authorize the court's order, which reflects an incorrect view of pretrial discovery in a criminal case. We address the bases upon which the court relied in turn.[4]

---

4. Each of these bases implicate a legal question that is reviewed de novo. *See* *State v. O'Neal*, 2024 S.D. 40, ¶ 35, 9 N.W.3d 728, 744 (quoting *State v. Krouse*, 2022 S.D. 54, ¶ 47, 980 N.W.2d 237, 251) ("We review '[a]n alleged violation of a defendant's constitutional right to due process' under a de novo

(continued . . .)

***A prosecutor's obligation under Brady v. Maryland***

[¶17.]        The rule originally stated in *Brady*, and calibrated in a succession of later cases, imposes an obligation upon prosecutors to disclose information to the defense that is either exculpatory or has impeachment value.  *See Strickler v. Greene*, 527 U.S. 263, 280–81, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999) (tracing the development of the *Brady* rule).  A prosecutor's duty under *Brady* is a solemn one, rooted in due process and transcending subjective good faith.  *See State v. Absolu*, 2024 S.D. 66, ¶¶ 37–39, ___ N.W.3d ___ (discussing *Brady*).  For this reason, prosecutors cannot view information in their possession parochially but must meet their obligation to "learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police."  *Erickson v. Weber*, 2008 S.D. 30, ¶ 18, 748 N.W.2d 739, 745 (quoting *Strickler*, 527 U.S. at 281, 119 S. Ct. at 1948).

[¶18.]        There is nothing here that implicates *Brady*, at least not at this point.  *Brady's* command is stern, to be sure, but it does not require prosecutors to investigate defense theories.  Indeed, we have held precisely that.

[¶19.]        In *State v. Erickson*, 525 N.W.2d 703 (S.D. 1994), the defendant was charged with sexual contact with a child and "filed a motion for discovery of names and addresses of all physicians or counselors with whom the victim may have

---

(. . . continued)
standard."); *see also State v. Little Long*, 2021 S.D. 38, ¶ 29, 962 N.W.2d 237, 249 ("[W]e review whether [defendant's] Sixth Amendment right to confrontation was violated de novo."); *State v. Kurtz*, 2024 S.D. 13, ¶ 12, 4 N.W.3d 1, 4 ("Whether the circuit court misinterpreted or misapplied [a statute] involves a question of statutory interpretation, which we review de novo[.]").

spoken about the alleged sexual conduct." 525 N.W.2d at 710. Though he was uncertain as to "whether such material or information existed," the defendant nevertheless argued that the prosecution was obligated "to make inquiry of the victim or her mother regarding any counseling the victim may have received." *Id.* For its part, "[t]he State claimed it had no knowledge of any such persons or consultations." *Id.*

[¶20.] We affirmed the circuit court's decision which limited the prosecutor's disclosure, under the circumstances, to "copies of any counselors' reports the State *had obtained or may subsequently obtain* . . . [and] . . . any releases of information signed by the victim." *Id.* (emphasis added). On general principles, the circuit court recognized that "the victim had a right to consult with counselors and/or physicians in private." *Id.* We stated our reasoning in the following terms:

> There is no evidence in the present case that the prosecution ever had the information requested by [the defendant]. [The defendant] himself did not know whether such information existed. Consequently, the prosecution could not suppress this evidence. Further, while the State cannot suppress evidence favorable to a defendant, it is not the state's duty to conduct a discovery examination for a defendant. *Brady* does not impose on the prosecution a general duty to help the defense find witnesses who might be favorable to the defendant. *Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess.

*Id.* (cleaned up).

[¶21.] The same analysis applies here. The *Brady* rule is truly not a discovery tool, and the circuit court erred by regarding it as one. Properly viewed, the *Brady* rule is a due process standard imposed, in the first instance, upon

prosecutors—not the courts.[5] *See United States v. Bagley*, 473 U.S. 667, 675 n.7, 105 S. Ct. 3375, 3380 n.7, 87 L. Ed. 2d 481 (1985) ("An interpretation of *Brady* to create a broad, constitutionally required right of discovery 'would entirely alter the character and balance of our present systems of criminal justice.'" (citation omitted)); *United States v. Miller*, 698 F.3d 699, 704 (8th Cir. 2012) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." (citation omitted)).

### *The right of confrontation*

[¶22.] Nor is the Sixth Amendment right of confrontation a discovery rule. It is, instead, a trial right guaranteed to a criminal defendant. The Supreme Court recognized as much in *Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53, 107 S. Ct. 989, 999, 94 L. Ed. 2d 40 (1987), and we have as well:

> The *Ritchie* Court held that the Confrontation Clause does not create "a constitutionally compelled rule of pretrial discovery." *Id.* at 52, 107 S. Ct. at 999. Instead, it affords criminal defendants two specific protections: "the right physically to face those who testify against him, and the right to conduct cross-examination." *Id.* at 51, 107 S. Ct. at 998.

*Milstead v. Smith*, 2016 S.D. 55, ¶ 12, 883 N.W.2d 711, 717.

[¶23.] We cited this same rule in *State v. Karlen*, 1999 S.D. 12, 589 N.W.2d 594, where we found the existence of a confrontation clause violation after the defendant had been convicted of rape and sexual contact. We held the defendant

---

5. In the event the circuit court would have conducted an in-camera review, it stated it would order the disclosure of any records that it deemed exculpatory. However, this formulation of *Brady* is incomplete. *Brady's* disclosure requirement applies equally to exculpatory *and impeachment* material.

was unable to effectively cross-examine one of the victims at trial because the circuit court granted a motion to quash the defendant's subpoena seeking the victim's counseling records and refused the defendant's request to review the record in-camera. Our decision turned largely on our determination that the victim had waived the statutory privilege that would have otherwise protected the victim's communications with his counselor.

[¶24.]      But *Karlen* cannot be read to authorize pretrial discovery to determine whether a broad class of information exists at all. The records in *Karlen* were known, and there was also evidence that the victim had related differing accounts of the events in question to third parties outside of the counseling setting.

[¶25.]      Neither can *Karlen* be used to universally authorize an in-camera inspection of subpoenaed records under the auspices of the Sixth Amendment. Instead, we simply determined in *Karlen* that the in-camera procedure was an appropriate means of balancing the victim's general privacy interests with the defendant's right of confrontation for unprivileged counseling records whose existence was known—circumstances that are starkly at odds with those we confront in this appeal.

### SDCL 23A-13-4

[¶26.]      Unlike *Brady* or the confrontation clause, SDCL 23A-13-4 *is* a discovery rule, but its plain text does not support the circuit court's order requiring the State to compel K.B. to disclose any counseling treatment. In the court's view, this was part of the State's "duty to exercise due diligence if they know or could

know of the evidence that pertains to the case." This, however, is not the discovery requirement of SDCL 23A-13-4, which provides:

> Upon written request of a defendant, the prosecuting attorney shall permit a defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, *which are within the possession, custody, or control of the prosecuting attorney*, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney, and which are material to the preparation of the defense or are intended for use by a prosecuting attorney as evidence in chief at the trial.

(Emphasis added.)

[¶27.] By its plain terms, SDCL 23A-13-4 requires prosecutors to exercise due diligence to learn of discoverable information that already exists "*within the possession, custody, or control*" of the prosecutor. (Emphasis added.) The statute does not require prosecutors to create discoverable information or conduct an investigation at the request of the defendant. A contrary reading of the statute would dramatically alter the relative roles of the parties in a criminal action. It would also affect the nature of the court's role, as the facts here illustrate. No matter how well intentioned, the circuit court here should have resisted the impulse to design a pretrial discovery plan to elicit information from a victim that is not part of the State's investigation and is not even known to exist.

[¶28.] In sum, then, none of the bases identified by the circuit court were sufficient, alone or in concert, to support the court's decision to require the State to ask K.B. about the existence of counseling records. The court should have simply resolved the motion to quash before it under the *Nixon* analysis we have adopted and applied in our previous decisions.

***Nixon and the motion to quash***

[¶29.] In our recent opinion in *State v. Waldner*, 2024 S.D. 67, ___ N.W.3d ___, we held that a victim does not have an absolute right to privacy under Marsy's Law. That is to say, information relating to a victim may be subject to production under a subpoena issued pursuant to SDCL 23A-14-5, which is our state law counterpart to Rule 17(c) of the Federal Rules of Criminal Procedure.

[¶30.] The determination of whether information from a victim is subject to production through a subpoena is guided by the three *Nixon* factors, or "hurdles," which must be established by the party seeking production: 1) relevancy, 2) admissibility, and 3) specificity with regard to the information requested. *See Waldner*, 2024 S.D. 67, ¶¶ 53–60, ___ N.W.3d ___ (applying factors from *Nixon*, 418 U.S. at 699, 94 S. Ct. at 3103); *see also Milstead*, 2016 S.D. 56, ¶ 20, 883 N.W.2d at 733–734 (adopting the *Nixon* test).

[¶31.] On the record before us, Antuna's subpoena falls patently short of the mark for any of these three areas of inquiry. The failure of proof under *Nixon* is self-evident; Antuna does not know if K.B. has even received counseling treatment as a result of the rape charged in the indictment. In the absence of this critical information, no court could begin to assess relevancy, admissibility, or specificity without asking instinctively, "of what?"

[¶32.] For this reason, we reverse the circuit court's order directing the State to compel K.B.'s response about the existence of counseling records with the additional requirements to subpoena them and furnish them to the court for an in-

camera review. And because there is no showing that would permit production under *Nixon*, we direct the court to grant the motion to quash Antuna's subpoena.

[¶33.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.